## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| | : |
| Plaintiff, | :  CIVIL ACTION |
| | : |
| v. | :  NO. 04 CV 12315 (PBS) |
| | : |
| TREYTON L. THOMAS and | : |
| PEMBRIDGE GROUP, LTD., | : |
| | : |
| Defendants. | : |

## DECLARATION OF J. LAUCHLAN WASH IN SUPPORT OF SECURITIES AND EXCHANGE COMMISSION'S APPLICATION FOR DEFAULT JUDGMENT

1.      I am a member of the bar of Massachusetts and an attorney for Plaintiff United States Securities and Exchange Commission (the "Commission"). I am employed as a Senior Enforcement Counsel in the Commission's Boston District Office. I make this Declaration in support of the Commission's application for the entry of judgment by default pursuant to Federal Rule of Civil Procedure 55(b)(2) against defendant Pembridge Group Ltd. ("Pembridge")

2.      I participated in the investigation giving rise to this action and have assisted in representing the Commission in this litigation since its inception. In that context, I am familiar with the facts and proceedings in this action and the matters alleged in the Commission's complaint. I have directed the Commission's efforts to effect service of the summons, complaint and other papers upon the defendants in this action.

3.      On November 1, 2004, the Commission filed a complaint ("Complaint"), alleging that Pembridge violated Sections 10(b) and 14(e) of the Securities Exchange Act of 1934

("Exchange Act") and Rules 10b-5 and 14e-8 thereunder. The Commission seeks a permanent injunction against future violations of the above provisions; disgorgement of ill-gotten gains in an amount to be determined and pre-judgment interest; and civil penalties. Attached hereto as **Exhibit 1** is a true and correct copy of the Complaint.

### The Commission Properly Served Pembridge

4.      On November 22, 2004, the Commission served Pembridge by delivering a copy of the summons and of the complaint in care of defendant Treyton L. Thomas ("Thomas") at 34 ½ Beacon Street, Boston, MA 02108-1415. Attached hereto as **Exhibit 2** is a true and correct copy of the Affidavit of Service filed with this Court on November 29, 2001.

5.      In sworn testimony Thomas admitted to causing Pembridge to be incorporated and described his relationship with Pembridge as "U.S. Adviser."

6.      My review of business records shows that Thomas rented office space for Pembridge at 60 State Street in Boston, Massachusetts. Thomas also testified that he maintained a home office at 34 ½ Beacon Street, Boston, MA 02108-1415 and established electronic mail accountS for Pembridge.

7.      My review of customer records indicate that during the relevant time period Thomas primarily communicated by telephone with persons associated with Imagis from his home office located at 34 ½ Beacon Street, Boston, MA 02108-1415.

8.      Thomas signed the letter dated March 6, 2002 proposing a tender offer for Imagis' shares as Chairman of Pembridge and conducted all of the negotiations for Pembridge related to the offer.

9.    Pembridge continues to maintain a website, for which Thomas is listed as the contact person.

### Trading in the Securities of Imagis

10.    My review of trading records and news articles shows that following Pembridge's proposed tender offer on March 6, 2002, and for several days afterwards, millions of Imagis shares changed hands through hundreds of transactions. News reports and trading records indicate that Imagis' securities experienced record trading volume and prices for several days following Pembridge's March 6 announcement. News reports and trading records show that the trading volume and price of Imagis' stock steadily declined up until Imagis announced that it had ended talks with Pembridge on July 9, 2002.

### Pembridge Has Not Filed An Answer Or Otherwise Responded to the Complaint

11.    Pembridge's time to answer or otherwise move with respect to the Complaint expired on December 12, 2004. To date, Pembridge has not filed an answer or otherwise responded to the Complaint.

12.    On June 10, 2002, the Clerk of this Court issued a Certificate of Default pursuant to Fed. R. Civ. P. 55(a) against Pembridge for its failure to answer or otherwise respond to the Complaint. Attached hereto as **Exhibit 3** are true and correct copies of these certificates.

### Federal Rule of Civil Procedure 55(b)(2)

13.    To my knowledge, none of the defendants are infants or incompetent for purposes of Federal Rule of Civil Procedure 55(b)(2).

14.    Because Pembridge defaulted by failing to answer the complaints or otherwise defend these actions, no notice of the Commission's request for a judgment by default is required to be sent to them.  Fed. R. Civ. P. 55(b)(2).

I state under the penalties of perjury that the foregoing is true and correct.

Dated: July 12, 2005
Boston, Massachusetts

J. Lauchlan Wash

4

# Exhibit 1



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2004 NOV -1  P 2: 05

U.S. DISTRICT COURT
DISTRICT OF MASS.

SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

     v.

TREYTON L. THOMAS and
PEMBRIDGE GROUP, LTD.,

                Defendants.

CIVIL ACTION

04 CV 12315 PBS
NO.

TRIAL BY JURY
DEMAND

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges that:

## SUMMARY

1.      Defendant Treyton L. Thomas ("Thomas") and Defendant Pembridge Group, Ltd. ("Pembridge"), a purported investment firm founded by Thomas, engaged in a scheme during 2002 to manipulate the price of the stock of Imagis Technologies, Inc. ("Imagis"), a publicly traded Canadian software company. The scheme culminated in the Defendants fraudulently announcing their intent to make a cash tender offer to Imagis' shareholders, thereby artificially inflating the value of Imagis' shares, including over 100,000 shares that Thomas had arranged for an offshore entity to obtain.

2.      During the period of 1999 through 2002, the Defendants caused several false press releases to be issued so as to create the perception that Thomas was at the helm of a substantial offshore investment firm, Pembridge. According to the Defendants' press releases, Pembridge was a multi-faceted investment firm that controlled and managed several hundred millions of

dollars for institutional investors. In fact, Pembridge had no such assets under management or in its custody and was instead simply a front through which Thomas attempted to gain credibility.

3.      On March 6, 2002, the Defendants, relying on the false legitimacy established by their prior releases, made a fraudulent public announcement of Pembridge's proposed tender offer for Imagis' stock. The Defendants' press release stated that Pembridge planned to take "Imagis private by a form of transaction that would result in the existing shareholders receiving cash for their Imagis shares." The Defendants noted in the release that Pembridge planned a tender price of over $4 cash per share — almost double the price at which Imagis' stock was trading in previous months — and requested a response from Imagis within thirty days.

4.      The fraudulent announcement sent the price of Imagis stock up to a 52-week high with record-level volume -- $5.36 (CDN) on the Toronto Exchange, up $1.44 (CDN) from the day before, and $3.40 on the NASDAQ Over the Counter Bulletin Board ("OTC BB"), up $0.93 from the prior day.[1]

5.      The Defendants' March 6, 2004 announcement was fraudulent in that neither Defendant had the intention nor the financial resources to complete the proposed tender offer. Contrary to their prior press releases, the Defendants did not control or have access to the hundreds of millions of dollars described in the pre-March 2002 press releases, let alone the resources necessary to buy out Imagis' shareholders.

6.      The Defendants issued their fraudulent announcement to manipulate the price of Imagis' stock. Prior to announcing the false tender proposal, the Defendants had arranged for an

---

[1] Prices are in US dollars unless followed by "CDN," which indicates that the price is quoted in Canadian dollars.

offshore entity – known as Indo Sakura Trust ("Indo Sakura") – to acquire over 100,000 warrants of Imagis stock. Shortly before the Defendants made their fraudulent March 6 tender offer announcement, Indo Sakura converted 70,000 warrants to shares and, a few days after the bogus release, Indo Sakura exercised its remaining 35,000 warrants. Pembridge also acquired warrants to purchase 50,000 shares of Imagis stock at $2.20 (CDN) a share. Additionally, the Defendants' advised purported clients to purchase Imagis stock. The Defendants' illicit scheme artificially inflated the value of Indo Sakura's Imagis stock, as well as the securities held directly by Pembridge and its purported clients.

      7.     By knowingly or recklessly engaging in the transactions and practices alleged in this Complaint:

          a.     Thomas and Pembridge violated Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5];

          b.     Thomas and Pembridge violated Section 14(e) of the Exchange Act and Rule 14e-8 thereunder [15 U.S.C. § 78n(e) and 17 C.F.R. § 240.14e-8].

      8.     Unless enjoined, the Defendants are likely to commit such violations in the future. Accordingly, the Commission seeks entry of a permanent injunction against each Defendant prohibiting further violations of the federal securities laws. The Commission also seeks from the Defendants: disgorgement of all ill-gotten gains received as a result of the conduct alleged in this Complaint, plus prejudgement interest; civil monetary penalties; a penny stock bar; and a permanent bar prohibiting Thomas from serving as an officer or director of a public company.

## JURISDICTION

9.      This Court has jurisdiction over this action pursuant to Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78t and 78aa].  Additionally, many of the fraudulent acts and practices alleged herein originated from the Commonwealth of Massachusetts, where Thomas resided and ran an office for Pembridge during the period of the manipulation scheme.

10.      In connection with the conduct alleged herein, the Defendants, directly and/or indirectly, made use of the means or instrumentalities of interstate commerce, the mails, and/or the facilities of national exchanges.

## DEFENDANTS

11.      Treyton L. Thomas, age 48, resides in Boston, MA.   Thomas held himself out as the founder, chairman, and U.S. representative of Pembridge during the period of the manipulation scheme.  Thomas served as a member of Imagis' Board of Directors from July 2002 to March 2004.

12.      Pembridge Group, Ltd., is a Cayman Island entity that was based in Boston, Massachusetts during the time of the conduct described in the Complaint.   Thomas formed Pembridge sometime in the mid-1990s.

## RELATED ENTITIES

13.      Imagis Technologies, Inc. is a British Columbian corporation which maintains its principal place of business in Vancouver, Canada.  Imagis develops and markets facial recognition software.  Imagis' securities are registered pursuant to Section 12(g) of the Exchange Act and are quoted on the OTC BB, and traded on the Toronto Stock Exchange in Canada. Imagis' stock was a penny stock during the period of the conduct described below.

4

14.    Indo Sakura Trust, Ltd. is an offshore entity for which Thomas arranged the acquisition of 105,000 Imagis warrants at exercise prices well below the price the Imagis shares rose to following the Defendants' March 6, 2002 announcement.  Through at least the beginning of 2002, Thomas also exercised, purportedly through Pembridge, trading authority over Indo Sakura assets.

## THOMAS FALSELY TOUTED PEMBRIDGE'S STATUS AND SUCCESSES

15.    During 1999 through 2002, Thomas issued or caused Pembridge to issue several press releases touting himself as the driving force behind a very successful offshore investment management firm, Pembridge.  Thomas held Pembridge out as "a premier alternative asset management firm in Boston . . . [that] serves as advisor to Pembridge Fund Management (PFM), the asset management arm of the firm that manages the Concert series of equity hedge funds, the Symphony fund-of-funds, and Pembridge Venture Partners, the private-equity affiliate."  Thomas represented that Pembridge managed or had custody of over several hundred million dollars, with sophisticated institutional investors as clients.

16.    While promoting himself and Pembridge, Thomas often interacted with the press and other third parties using aliases of non-existent Pembridge employees.  For example, Bradford Harrington and Tyler Carrington, purported Pembridge employees who interacted with the public and/or were cited in press reports, were fictitious characters created and acted out by Thomas.

17.    In September 1999, Thomas caused Pembridge to issue a release carried on Business Wire falsely claiming that the firm "manages or has custody over capital in excess of (USD) $400,000,000" and noting that investments in its hedge funds are available to "accredited

non-U.S. institutions with a minimum threshold investment of (USD) $ 3,000,000 and are currently closed to new investors." The release noted that individuals wanting further information should contact "Ms. Tyler Carrington," one of the personas invented by Thomas to interact with the public.

18.    In another release in January 2000, Defendants claimed that Pembridge's "Concert Fund" had achieved a "102.3% total-return for the year ending 12/31/99," and noted that Pembridge controlled more than $400,000,000 in assets. Once again, inquires concerning Pembridge were directed to the attention of Ms. Tyler Carrington.

19.    Contrary to the Defendants' public statements, however, Pembridge was a sham. It did not "manage or have custody" over hundreds of millions of dollars of assets. In fact, with the limited exception of Indo Sakura, Pembridge did not have any form of discretionary, managerial, or decision making authority over any substantial assets.

## THOMAS, USING A FALSE NAME, ARRANGED
## FOR INDO SAKURA TO PURCHASE IMAGIS STOCK.

20.    Thomas' connection to Indo Sakura dates back to the late 1990s, when he arranged for Indo Sakura to invest approximately $250,000 at a Connecticut-based investment adviser. Thomas served as the contact person for Indo Sakura's dealings with this Connecticut adviser and was the person from whom the adviser took instructions regarding how to handle the account.

21.    In the fall of 2001, Thomas again arranged for investments on behalf of Indo Sakura. This time, posing as Bradford Harrington to Imagis, Thomas arranged for Indo Sakura to purchase Imagis warrants in a private placement offering. On or about November 5, 2001, Indo

6

Sakura obtained 70,000 Imagis warrants for $151,900 (CDN) ($2.17 (CDN) per warrant). Each

warrant entitled Indo Sakura to obtain one share of Imagis stock at no further cost and an

additional 35,000 warrants exercisable for 35,000 shares of Imagis stock at $2.55 (CDN) per

share. Thus, by participating in the private placement, Indo Sakura obtained the right to receive

105,000 shares of Imagis common stock at an effective price of approximately $2.30 (CDN) a

share.

      22.     The Defendants also recommended to their purported  clients that they purchase

Imagis stock and believed that such purchases had been made prior to the March 6, 2002

announcement described below.

## THOMAS ARRANGED FOR PEMBRIDGE TO ENTER INTO A CONSULTANT ARRANGEMENT WITH IMAGIS AND CONTINUED TO TOUT PEMBRIDGE.

      23.     In December 2001, one month after arranging for Indo Sakura to obtain the Imagis

warrants, Thomas approached Imagis to propose a consultant arrangement in which he would

advise the company concerning alternative ways of financing operations.

      24.     On January 3, 2002, Imagis publicly announced that it had engaged Thomas and

Pembridge Venture Partners ("PVP"), described as a Pembridge affiliate, to provide "strategic

financial advice." Imagis' press release, using information provided by the Defendants, noted

that PVP was the "private-equity affiliate" of Pembridge that "provides growth capital to

formative companies in the areas of software, data-storage, networking, and the health sciences."

The press release also stated that "Pembridge manages over $600,000,000 in capital."

      25.     Imagis granted PVP warrants exercisable to acquire 50,000 shares of common

stock at $2.20 (CDN) a share as compensation for its consulting services.

26.    On February 21, 2002, an article was published on Business Wire using information provided by Thomas to promote himself and Pembridge. The article notes Thomas' interest in facial recognition software and the possibility that he may find "a unique small-cap and make a case that it should go private." The article states that Thomas set up Pembridge's venture capital division as a fund with "$30-100 million at its disposal from existing investors" to carry out its investment strategies.

## INDO SAKURA EXERCISED ITS WARRANTS
## AND THOMAS PUMPED IMAGIS' STOCK.

27.    On or about February 26, 2002, Indo Sakura exercised the first tranche of its warrants, obtaining 70,000 shares of Imagis.

28.    Eight days later, on March 6, 2002, the Defendants knowingly or recklessly artificially inflated Imagis' stock price by publicly announcing Pembridge's false intention to take Imagis private in a cash tender offer. Pembridge announced that it was requesting Imagis' Board of Directors to consider a plan whereby Imagis' shareholders would receive $4.10 cash per share. The Defendants' March 6, 2004 announcement was fraudulent in that neither Defendant had the intention nor the financial resources to complete the proposed tender offer. Contrary to their prior press releases, the Defendants did not control or have access to the hundreds of millions of dollars described in the pre-March 2002 press releases, let alone the resources necessary to buy out Imagis' shareholders.

8

29.    The Defendants' fraudulent March 6, 2002 press release stated, in relevant part, that:

> [Pembridge has] . . . sent a letter to the board of directors of Imagis . . . proposing that discussions be held with a view to taking Imagis private by a form of transaction that would result in the existing shareholders receiving cash for their Imagis shares.  Based on public information . . . [Pembridge] believes that the price per common share of the going private transaction should be U.S. $4.10.

30.    The $4.10 price represented an almost 60% premium over Imagis' March 5, 2004 market price.  At the time, Imagis had more than 16,000,000 shares of common stock issued and outstanding, such that the transaction proposed by the Defendants required more than $65,000,000 to complete.

31.    The Defendants falsely stated in their press release that Pembridge intended to use Imagis as a platform to build a multi-product company.  The press release also falsely noted that "Pembridge is a private investment firm acting as <u>principal</u> . . . . " (emphasis added).  The language used by the Defendants in their the press release knowingly or recklessly gave the false impression that Pembridge was in a position to complete the tender offer.   The fraudulent announcement was made to inflate the price of Imagis' share price by causing investors to purchase and/or sell their shares to take advantage of the price offered in the proposed tender offer.

32.    The illicit effect of the March 6, 2002 press release was bolstered by the false picture of Pembridge as an active investment management firm with a strong private equity division and hundreds of millions of dollars under management that was created by the Defendants' prior false press releases.

33.     The Defendants' March 6, 2002 letter to Imagis' Board of Directors fraudulently stated that:

> Accordingly, provided that agreement can be reached with the Imagis Board of Directors ("the Board") on the principal elements of a transaction to privatize Imagis, Pembridge is willing, alone or in combination with others as yet undetermined partners (together, the "Pembridge Investors"), to fund or arrange the funding necessary to achieve this result by cashing out the existing stockholders.

34.     Using information provided by the Defendants, Imagis also issued a press release on March 6, 2002 and made other public statements noting Pembridge's potential $4.10 cash tender offer. Imagis' statements further legitimatized Pembridge's false proposal.

35.     The March 6, 2002 announcements sent the price of Imagis to a 52-week high on both the Toronto Stock Exchange and OTC BB -- with record volume on both exchanges. The price reached $5.36 (CDN) on the Toronto Exchange, up $1.44 (CDN) from the day before and rose to $3.40 on the OTC BB, up $0.93 from the prior day.

36.     On or about March 11, 2002, Indo Sakura exercised its additional warrants and obtained 35,000 shares at $2.55 (CDN) a share for $89,250 (CDN). Indo Sakura sold its Imagis shares after the announcement of the fraudulent tender offer.

37.     Soon after the Defendants announced Pembridge's intention to make a tender offer, press reports began to question the bonafides of Mr. Thomas and Pembridge and the price of Imagis' stock declined.

38.     In the months following the fraudulent March 6, 2002 announcement, Thomas continued to act as if Pembridge was willing and able to move forward with the tender transaction, even extending the initial thirty day response period to give Imagis additional time to

10

respond to Pembridge's offer.

39.    On or about July 9, 2002, Imagis officially announced that it had ended talks concerning a possible takeover by Pembridge.

40.    The Defendants knew or recklessly disregarded the fact that their March 6, 2002 press release and tender offer were false and that it would cause the price of Imagis' stock to rise. The Defendants knew or recklessly disregarded that their illicit scheme artificially inflated the value of Indo Sakura's Imagis stock, as well as securities held directly by Pembridge and its purported clients.  The Defendants received ill-gotten gains as a result of their manipulation of Imagis stock.

41.    By knowingly or recklessly engaging in the conduct and practices alleged in this Complaint, Thomas and Pembridge violated:  Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]; Section 14(e) of the Exchange Act and Rule 14e-8 thereunder [15 U.S.C. § 78n(e) and 17 C.F.R. § 240.14e-8].

## FIRST CLAIM

### Fraud in the Purchase and Sale of Securities in Violation of Exchange Act §10(b) and Rule 10b-5 Thereunder

42.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-41 of the Complaint as if set forth fully herein.

43.    By reason of the foregoing, the Defendants knowingly or recklessly, acting intentionally, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the offer, sale, or purchase of securities: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state a material fact

11

necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; (c) obtained money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (d) engaged in transactions, acts, practices, or courses of business which operated as a fraud or deceit upon other persons.

44.    As a result, the Defendants violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

45.    The Defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss or significant risk of substantial loss to other persons, within the meaning of Section 21(d)(3) of the Exchange Act [15 U.S.C. §78(u)(3)]. Therefore, the Defendants are subject to imposition of significant civil penalties.

## SECOND CLAIM

### Fraud in Connection with a Pre-Commencement Communication Concerning a Tender Offer in Violation of Exchange Act § 14(e) and Rule 14e-8 Thereunder

46.    Commission repeats and incorporates by reference the allegations in paragraphs 1-43 of the Complaint as if set forth fully herein.

47.    Section 14(e) of the Exchange Act makes it unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not

necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; (c) obtained money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (d) engaged in transactions, acts, practices, or courses of business which operated as a fraud or deceit upon other persons.

44.    As a result, the Defendants violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

45.    The Defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss or significant risk of substantial loss to other persons, within the meaning of Section 21(d)(3) of the Exchange Act [15 U.S.C. §78(u)(3)]. Therefore, the Defendants are subject to imposition of significant civil penalties.

## SECOND CLAIM

### Fraud in Connection with a Pre-Commencement Communication Concerning a Tender Offer in Violation of Exchange Act § 14(e) and Rule 14e-8 Thereunder

46.    Commission repeats and incorporates by reference the allegations in paragraphs 1-43 of the Complaint as if set forth fully herein.

47.    Section 14(e) of the Exchange Act makes it unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not

12

misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. Rule 14e-8 [15 U.S.C. § 78n(e) and 17 C.F.R. § 240.14e-8] states that it is a fraudulent, deceptive or manipulative act or practice within the meaning of Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] for any person to publicly announce that the person (or a party on whose behalf the person is acting) plans to make a tender offer that has not yet been commenced, if the person: (a) is making the announcement of a potential tender offer without the intention to commence the offer within a reasonable time and complete the offer; (b) intends, directly or indirectly, for the announcement to manipulate the market price of the stock of the bidder or subject company; or (c) does not have the reasonable belief that the person will have the means to purchase securities to complete the offer.

48.    As described above, Thomas and Pembridge violated Section 14(e) and Rule 14e-8 thereunder by publicly announcing that they intended to commence a cash tender offer to Imagis shareholders when in fact they (a) had no intention of actually commencing a tender offer or any reasonable belief that they would have the means to purchase the shares necessary to complete the tender offer, and (b), made the announcement to manipulate the price of Imagis shares.

49.    As a result, the Defendants violated and, unless enjoined, will continue to violate Section 14(e) of the Exchange Act and Rule 14e-8 thereunder [15 U.S.C. § 78n(e) and 17 C.F.R. § 240.14e-8].

50.    The Defendants' conduct involved fraud, deceit, or deliberate or reckless

13

disregard of regulatory requirements, and resulted in substantial loss or significant risk of substantial loss to other persons, within the meaning of Section 21(d)(3) of the Exchange Act [15 U.S.C. §78(u)(3)]. Therefore, the Defendants are subject to imposition of significant civil penalties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Commission respectfully requests that this Court issue a Final Judgement:

### I.

Permanently enjoining the Defendants from violating, directly or indirectly:

    a.    Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder; and

    b.    Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)]and Rule 14e-8 [17 C.F.R. § 240.14e-8] thereunder.

### II.

Requiring the Defendants to disgorge any ill-gotten gains, including pre-judgment interest thereon, with said monies and interest to be paid in accordance with a plan of distribution to be ordered by the Court.

### III.

Requiring the Defendants to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] in an amount to be determined by the Court.

### IV.

Permanently prohibiting the Defendants from participating in an offering of penny stock pursuant to Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78o(d)].

### V.

Permanently prohibiting Thomas from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## VI.

Ordering such other and further relief as this case may require and the Court deems appropriate.

### JURY DEMAND

The Commission hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

Walter G. Ricciardi
District Administrator

R. Daniel O'Connor
Senior Trial Counsel (BBO# 634207)
oconnord@sec.gov

Philip C. Koski
Branch Chief (BBO# 568073)
koskip@sec.gov

J. Lauchlan Wash
Senior Counsel (BBO# 629092)
washj@sec.gov

ATTORNEYS FOR PLAINTIFF
SECURITIES AND EXCHANGE
COMMISSION
73 Tremont Street, Suite 600
Boston, Massachusetts
(617) 573-8900
(617) 424-5940 (Facsimile)

Dated: November 1st, 2004

16

# Exhibit 2

COPY

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

FILED
IN CLERKS OFFICE

District of          Massachusetts

2004 NOV 22 A 11: 21

U.S. DISTRICT COURT
DISTRICT OF MASS.

Securities and Exchange Commission

V.

Treyton L. Thomas and Pembridge Group, LTD

**SUMMONS IN A CIVIL ACTION**

CASE NUMBER:

## 04  12315  PBS

TO: (Name and address of Defendant)

Pembridge Group, LTD
c/o Thomas L. Treyton
34 1/2 Beacon St,
Boston, MA 02108-1415

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Daniel O'Connor, Esq.
Securities and Exchange Commission
73 Tremont St. Suite 600
Boston, MA 02108

an answer to the complaint which is served on you with this summons, within _____20_____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the
Clerk of this Court within a reasonable period of time after service.



11/1/2004

CLERK

(By) DEPUTY CLERK

DATE

# RETURN OF SERVICE

| Service of the Summons and Complaint was made by me (1) | DATE | November 01, 2004 |
|---|---|---|
| **NAME OF SERVER**    BURTON M. MALKOFSKY | TITLE | Process Server / A Disinterested Person |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served:

_____ , MASSACHUSETTS

☐ Left copies thereof at the defendant's dwelling or usual place of abode with a person of suitable age and discretion then residing therein. Name of person whom the summons and complaint were left:

_____

Said service was made at: _____ , MASSACHUSETTS

☒ Other: By handing true and attested copies thereof to _____ **Thomas L. Treyton,** _____

Duly Authorized Agent for the within-named     **Defendant, Pembridge Group, LTD.**

Said service was made at:

**34 1/2 Beacon Street, Boston** _____ , MASSACHUSETTS

## STATEMENT OF SERVICE FEES

| SERVICE FEE $ | 20.00 | Trips | |
|---|---|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____ **November 01, 2004** _____          *Signature of Server*
                              Date

One Devonshire Place, Boston, Massachusetts
*Address of Server*

## ADDITIONAL INFORMATION

PLEASE NOTE THAT IT WAS NECESSARY TO MAKE _____ ATTEMPTS BEFORE MAKING PROPER SERVICE.

|  |  |  | FEE |
|---|---|---|---|
| Date | Time | Remarks | |
| | | | $ _____ |
| | | | $ _____ |
| | | | $ _____ |
| | | | $ _____ |
| | | | $ _____ |
| | | | $ _____ |
| | | TOTAL | $ _____ |

(1) As to who may serve a summons see Rule 4 to the Federal Rules of Civil Procedure.

**Suvalle, Jodrey & Associates**                **One Devonshire Place**           Telephone # (617) 720-5733
**Massachusetts Constables since 1925**        **Boston, MA 02109**              Fax #        (617) 720-5737