UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SECURITES AND EXCHANGE COMMISSION, | : | |
| Plaintiff, | : | CIVIL ACTION |
| v. | : | NO. 04 CV 12315 (PBS) |
| TREYTON L. THOMAS and PEMBRIDGE GROUP, LTD., | : | |
| Defendants. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF
SECURITIES AND EXCHANGE COMMISSIONS'S
APPLICATION FOR DEFAULT JUDGMENT
AGAINST DEFENDANT PEMBRIDGE GROUP, LTD.**

R. Daniel O'Connor
 Senior Trial Counsel (BBO# 634207)
 oconnord@sec.gov
J. Lauchlan Wash
 Senior Counsel (BBO# 629092)
 washj@sec.gov
ATTORNEYS FOR PLAINTIFF
SECURITIES AND EXCHANGE
COMMISSION
73 Tremont Street, Suite 600
Boston, Massachusetts
(617) 573-8900
(617) 424-5940 (Facsimile)

**PRELIMINARY STATEMENT**

Plaintiff Securities and Exchange Commission (the "Commission") respectfully submits this Memorandum of Law in support of its application for the entry of a final judgment by default pursuant to Fed. R. Civ. P. 55(b)(2) against Pembridge Group, Ltd. ("Pembridge" or the "Defendant"). The Commission filed this action on November 1, 2004 alleging that from 1999 through 2002 the Pembridge engaged in a fraudulent scheme co-Defendant Treyton L. Thomas ("Thomas") to manipulate the public market for Canadian based Imagis Technologies, Inc.'s ("Imagis'") stock in violation of the federal securities laws. The Commission properly completed service of process against the Pembridge. However, Pembridge has failed to file an answer or otherwise appear and defend, and the Clerk of this Court has noted it in default pursuant to Fed. R. Civ. P. 55(a). The Commission now seeks entry of a default judgment against Pembridge on the basis of the following facts set forth in the Commission's Complaint.

**I.     STATEMENT OF FACTS**

    **A.     Pembridge Sets the Stage with False Public Information About Its Status and Success**

Pembridge is a Cayman Island entity founded by Thomas. (Comp. ¶12) Thomas held himself out as the founder, chairman, and U.S. representative of Pembridge during the time period from 1999 through 2002. (Comp ¶11-12) During 1999 through 2002, Pembridge issued press releases touting itself as a "premier alternative asset management firm in Boston . . . [that] serves as adviser to Pembridge Fund Management (PFM), the asset management arm of the firm that manages the Concert series of equity hedge funds, the Symphony fund-of-funds, and Pembridge Venture Partners, the private-equity affiliate." (Comp ¶¶2, 15) Pembridge claimed

that it "manages or has custody over capital in excess of (USD) $400,000,000" and had achieved an annual return of "102.3% total-return for the year ending 12/13/99." for one its funds." (Comp. ¶¶17, 18)

Pembridge claimed that investments in its hedge funds are available to "accredited non-U.S. institutions with a minimum threshold investment of (USD) $3,000,0000." (Comp. ¶17) In fact, Pembridge did not manage millions on behalf of accredited non-U.S. institutions and was a sham used by Thomas to manipulate the stock of Imagis. (Comp ¶¶19, 26, 28-40)

    B.    <u>Thomas Uses Indo Sakura To Purchase Imagis Warrants</u>

In or about November 20001, Thomas, using an alias, arranged for a client of Pembridge's, that was also an offshore entity, Indo Sakura Trust, Ltd. ("Indo Sakura"), to obtain 70,000 Imagis warrants for $151,900 (CDN) in a private placement offering. (Comp. ¶¶14, 20-21) Each warrant entitled Indo Sakura to one share of Imagis and an additional 35,000 warrants exercisable for 35,000 shares of Imagis at $2.55 (CDN) per share for an effective price of approximately $2.30 (CDN) a share. (Comp. ¶21) At certain times prior to March 6, 2002, Pembridge also recommended that certain purported clients purchase Imagis stock. (Comp. ¶22)

    C.    <u>Pembridge Inflates Imagis's Stock With A False Tender Offer</u>

A month following Indo Sakura's purchase of Imagis warrants, Thomas approached Imagis to propose a consulting arrangement in which Pembridge would advise the Company concerning alternative ways of financing operations. (Comp. ¶23) On January 3, 2002, Imagis, using information provided by the Defendants, announced that it had engaged Pembridge Venture Partners (PVP) the private equity arm of Pembridge. (Comp. ¶24) The January 3 press release describes Pembridge as managing "over $600,000,000" and PVP as providing "growth

capital to formative companies." (Comp. ¶24) A Business Wire article published on February 21, 2002 noted Thomas' purported interest in taking a small cap facial recognition software company private and credits PVP with "$30-100 million at its disposal from existing investors" to carry out its investment strategies. (Comp. ¶26)

On March 6, 2002, Pembridge announced that it had requested Imagis' Board of Directors to consider a tender offer whereby each shareholder would receive (USD) $4.10 per share from Pembridge acting as principal. (Comp. ¶¶3, 28-30) The language used in the March 6 press release and other information made public prior to March 6 by the Defendants knowingly or recklessly gave the false impression that Pembridge was in the position to complete the tender offer. (Comp. ¶¶5, 31-32, 34)

The tender offer was made by Pembridge for the purpose of inflating the price of Imagis and Imagis's stock responded as expected by hitting a 52 week high on record volume on the Toronto Stock Exchange and the OTC BB on March 6, the day of the fraudulent proposed tender offer. (Comp. ¶¶ 1, 4, 6, 31, 35) On February 26, 2002, about a week before Pembridge's tender offer, Indo Sakura obtained 70,000 shares of Imagis' stock pursuant to its warrants. (Comp. ¶27) On March 11, 2002, about a week after Pembridge's tender offer, Indo Sakura exercised the remaining 35,000 warrants for $89,250 (CDN). (Comp. ¶36) Millions of Imagis shares changed hands through hundreds of transactions at artificially inflated prices following Pembridge's fraudulent tender offer on March 6, 2002, and for at least several days afterwards. (Comp. ¶¶ 31, 35; Declaration of J. Lauchlan Wash ¶10, attached hereto.)

D.   **Pembridge Continues the Fraud**

For months following its tender offer, Pembridge acted as if it were capable of

consummating the transaction and even extended the initial thirty day response period for acceptance of the offer in order to keep Imagis' stock price at inflated levels. (Comp. ¶¶3, 38) On July 9, 2002, Imagis officially announced that it had ended talks concerning a possible take over by Pembridge. (Comp. ¶39)

## II.    PROCEDURAL HISTORY

The Commission commenced this action on November 1, 2004 by filing the Complaint, and completed service of process against Defendant Pembridge by November 22, 2004. (Wash Decl. ¶¶3-9, attached hereto) Pembridge has failed to filed an answer or otherwise moved with respect to the Complaint. (Wash Decl. ¶11) The Clerk of the Court entered a default pursuant to Fed. R. Civ. P. 55(a) against Pembridge on June 10, 2005. (Wash Decl. ¶12)

## III.   ARGUMENT

### A.    The Commission Properly Served the Defendant with the Summons and the Complaint and it has failed to Answer

The Commission served the Defendant Pembridge in accordance with the relevant federal and state rules of service. (Wash Decl. ¶4) Despite being properly served in this action, Pembridge has failed to answer, or otherwise defend this action. The time for Pembridge to respond to the Complaint has expired. Consequently, Pembridge is in default and entry of judgment is appropriate.

### B.    Default Judgments Should Be Entered Against the Defendants

The entry of a default judgment is left to the "sound judicial discretion" of the court. 10 C. WRIGHT, A. MILLER, M. KANE, FEDERAL PRACTICE & PROCEDURE § 2685 (1998). Where, as here, "a party fails to respond, after notice the court is ordinarily justified in entering a judgment

5

against the defaulting party." Bermudez v. Reid, 733 F.2d 18, 21 (2d Cir. 1983).

Upon a defendant's default, the Court may accept as true all of the factual allegations of the complaint, except those relating to damages. Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co., 771 F.2d 5, 13 (1st Cir. 1985) ("default having been entered, each of [Plaintiff's" allegations of fact must be taken as true and each of its . . . claims must be considered established as a matter of law.")  The legal effect of default judgments in this case is to establish conclusively that the violations alleged in the Complaint did indeed occur. Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell v. Medfit Intern., Inc., 982 F.2d 686,  (1st Cir. 1993) ("entry of a default against a defendant establishes the defendant's liability").  Thus, the Court should accept as true all of the factual allegations of the Complaint.  As described below, the detailed allegations set forth in the Complaint establish that Pembridge violated numerous provisions of the federal securities laws.

1.  **Violations of Sections 10(b) and 14(e) of the Exchange Act, and Rules 10b-5 and 14e-8 thereunder**

Section 10(b) of the Exchange Act, [15 U.S.C. § 78j(b)], and Rule 10b-5, [17 C.F.R. § 240.10b-5], thereunder prohibit, among other things, materially false or misleading statements or omissions in connection with the purchase or sale of any security.  Violations of Section 10(b) and Rule 10b-5 require a showing of scienter, which is defined as a "mental state embracing intent to deceive, manipulate or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976).  Scienter may be established by a showing of recklessness. Greebel v. FTP Software, 194 F.3d 185 (1st Cir. 1999).  The scienter of a principal may be attributed to an entity. SEC v. Manor Nursing Centers, 458 F.2d 1082, 1096 n.16 (2d Cir. 1971) (scienter of an individual who

controls a business entity may be imputed to that entity).

Section 14(e) of the Exchange Act prohibits any person from making any untrue statement of a material fact or omitting to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.  The purpose of 14(e) is to ensure full and fair disclosure of material information concerning the offeror to the target shareholder.  See Piper v. Chris-Craft Industries, Inc., 430 U.S. 1, 23 (1977).  The standard for materiality in Section 14(e) tender offer cases is whether a reasonable investor might have considered the information important in making his investment decision to tender or hold his securities.  MAI Basic Four, Inc. and Choice Corporation v. Prime Computer, Inc. et al., 871 F.2d 212, 222 n.10 (1st Cir. 1989); Staffin v. Greenberg, 672 F.2d 1196 (3d Cir. 1982).

Rule 14e-8 states that it is a fraudulent, deceptive or manipulative act or practice within the meaning of Section 14(e) of the Exchange Act for any person to publicly announce that the person (or a party on whose behalf the person is acting) plans to make a tender offer that has not yet been commenced, if the person: (a) is making the announcement of a potential tender offer without the intention to commence the offer within a reasonable time and complete the offer; (b) intends, directly or indirectly, for the announcement to manipulate the market price of the stock of the bidder or subject company; or (c) does not have the reasonable belief that the person will have the means to purchase securities to complete the offer.

To establish a violation of the antifraud provisions of the securities laws, any misrepresentations and omissions must be material. <u>TSC Industries, Inc. v. Northway, Inc.</u>, 426 U.S. 438, 449 (1976). A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. <u>Id.</u> To satisfy the "in connection with" requirement under Section 10(b), the fraud need only "touch" on the purchase or sale of a security. <u>See</u> <u>SEC v. Zandford</u>, 122 S.Ct. 1899, 1904 (2002).

Pembridge violated Sections 10(b) and 14(e) and Rules 10b-5 and 14e-8 by participating in a scheme to manipulate Imagis' stock price by issuing a false and misleading press release on March 6, 2002. In that release, Pembridge announced that it had requested Imagis' Board of Directors to consider a tender offer whereby Pembridge would pay each existing shareholder would receive (USD) $4.10 per share. The March 6 release was false and misleading because Pembridge did not have control adequate financial resources or have the intent to consummate the proposed transaction. Pembridge's prior press releases concerning its purported money under management and millions at its disposal to carry out its investment strategies contributed to the materially of the March 6 release. The materiality of the announcement was reflected in the record increases in the price and volume of Imagis' stock on March 6. By acting as if it were capable of consummating the transaction and extending the initial response period for acceptance of the offer, Pembridge acted to prolong the impact of its statements by approximately three more months. Pembridge issued the March 6 release in order to manipulate Imagis' stock price, which benefitted at least one of its clients, Indo Sakura. Thomas' scienter is attributed to Pembridge the entity he used to accomplish his scheme.

C.  **Pembridge's Conduct Warrants Entry of Permanent Injunctions Against Future Violations**

The Complaint seeks injunctive relief, permanently enjoining Pembridge from further violations of Section 10(b) of the Exchange Act, [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder, [17 C.F.R. § 240.10b-5], and Section 14(e) of the Exchange Act, [15 U.S.C. § 78n(e)] and Rule 14e-8 thereunder, [17 C.F.R. § 240.14e-8]. The authority of a federal district court to order permanent injunctive relief in a Commission enforcement action is well established. See, e.g., SEC v. McNulty, 137 F.3d 732, 741 (2d Cir. 1998); SEC v. Commonwealth Chem. Sec., Inc., 574 F.2d 90, 99-100 (2d Cir. 1978); SEC v. Management Dynamics, Inc., 515 F.2d 801, 807 (2d Cir. 1975); SEC v. Benson, 657 F. Supp. 1122, 1132-33 (S.D.N.Y. 1987). Permanent injunctions may be ordered as part of a judgment by default upon a finding by the Court that a factual basis for such relief exists. See, e.g., SEC v. McNulty, 137 F.3d at 736-37; Management Dynamics, Inc., 515 F.2d at 814.

Section 20(b) of the Securities Act, [15 U.S.C. § 77t(b)], and Section 21(d) of the Exchange Act, [15 U.S.C. § 78u(d)], empower the Commission to seek permanent injunctive relief upon a showing that (1) violations of the securities laws have occurred, and (2) there is a reasonable likelihood that violations will occur in the future. Commonwealth Chem. Sec., Inc., 574 F.2d at 99-100; SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1100-1101 (2d Cir. 1972); Benson, 657 F. Supp. at 1132-33.[1] To determine whether there is a reasonable likelihood that a defendant will commit future violations, courts generally consider: (I) the egregiousness of the conduct; (ii) the isolated or recurrent nature of the infraction; (iii) the degree of scienter involved; (iv) the sincerity

---

[1] Unlike private litigants, the Commission need not show risk of irreparable injury, or the unavailability of remedies at law in a request for injunctive relief. SEC v. Unifund SAL, 910 F.2d 1028, 1036 (2d Cir. 1990).

of the defendant's assurances against future violations; and (v) the defendant's recognition of the wrongful nature of his conduct.  SEC v. Universal Major Indus. Corp., 546 F.2d 1044, 1048 (2d Cir. 1976); see also SEC v. Manor Nursing Ctrs., Inc., 458 F.2d at 1100.

As discussed above, Pembridge violated several provisions of the securities laws by participating in a scheme to manipulate Imagis' stock price by issuing a false and misleading press release on March 6, 2002.  The fraudulent proposed tender offer was the culmination of a series of false press releases issued over several months that portrayed Pembridge as a well endowed hedge fund that was active in the securities market.  Pembridge used its fraudulent status to gain a contract with Imagis as a financial adviser.  Next, Pembridge engaged in a manipulative scheme that negatively impacted hundreds of investors who purchased the inflated stock of Imagis.  Finally, Pembridge parlayed its falsely created status to position its chairman for a seat on Imagis's board of directors.

Because these violations were egregious, extended for a period of months, and were committed with a high degree of scienter, Pembridge should be enjoined from future violations of Section 10(b) of the Exchange Act, [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder, [17 C.F.R. § 240.10b-5], and Section 14(e) of the Exchange Act, [15 U.S.C. § 78n(e)] and Rule 14e-8 thereunder, [17 C.F.R. § 240.14e-8].

    **D.**    **This Court Should Order Pembridge to Disgorge Any Ill-Gotten Gains and Prejudgment Interest Thereon and Impose A Civil Penalty**

In addition it is appropriate for the Court to order disgorgement of any ill-gotten gains received by Pembridge, plus prejudgment interest thereon.  See, e.g., SEC v. First City Fin. Corp., 890 F.2d 1215, 1230 (D.C. Cir. 1989).  The Commission respectfully requests that Pembridge be

ordered to disgorge any ill-gotten gains. At this point, the Commission is still in the process of conducting discovery related to the amount of Pembridge's ill-gotten gains. The Commission requests leave to submit proof to the Court within thirty days of the close of discovery in this case as to the appropriate amount of disgorgement.

The Commission respectfully requests that the Court impose civil penalties against Pembridge. Under Section 20(d)(2) of the Securities Act and Section 21(d)(3) of the Exchange Act, the Commission may seek civil penalties for violations of the federal securities laws. Like a permanent injunction, civil penalties are imposed to deter the wrongdoer from similar misconduct in the future. Accordingly, the factors considered to determine the likelihood of future violations for the purposes of a permanent injunction, are also useful in assessing civil penalties. SEC v. Brethen, 1992 U.S. Dist. LEXIS 20665 at *104 (S.D. Ohio 1992). When determining the appropriate civil penalty to impose, the Court examines factors such as (1) the egregiousness of violations, (2) the isolated or repeated nature of the violations, and (3) the degree of scienter involved. Id. See also SEC v. Deyon, 977 F. Supp. 510, 519 (D. Me. 1997); SEC v. Custable, 1996 U.S. Dist. LEXIS 19321 ** 13-14 (N.D. Ill. 1996).

The Exchange Act provides that the amount of the penalty is to be determined by the Court "in light of the facts and circumstances" of the particular case. In cases, such as here, in which Pembridge's conduct involved fraud and deliberate disregard of the federal securities laws and resulted either in substantial losses or created a significant risk of substantial loss, the Court is empowered to impose a third tier civil money penalty which is the greater of $550,000 per violation for entities, or the gross amount of the pecuniary gain from their fraudulent scheme. See Section 20(d)(2) of the Securities Act and Section 21(d)(3) of the Exchange Act and 17 C.F.R. § 201.1002.

As described above, Pembridge's violations were egregious, extended for a period of months, and were committed with a high degree of scienter. Moreover, they caused a great degree of actual harm to the hundreds of investors that bought Imagis stock at the artificially inflated prices following the false tender offer. The Commission respectfully requests that the Court impose against Pemrbidge the maximum penalty allowed by law, $550,000.

## IV.    CONCLUSION

For the foregoing reasons, the Commission respectfully requests that the Court enter a judgment by default against Pembridge. A proposed judgment is submitted herewith.

Respectfully submitted,

      /s/ R. Daniel O'Connor
R. Daniel O'Connor
  Senior Trial Counsel (BBO# 634207)
  oconnord@sec.gov
J. Lauchlan Wash
  Senior Counsel (BBO# 629092)
  washj@sec.gov
ATTORNEYS FOR PLAINTIFF
SECURITIES AND EXCHANGE COMMISSION
73 Tremont Street, Suite 600
Boston, Massachusetts
(617) 573-8900
(617) 424-5940 (Facsimile)

Dated: July 12, 2005